### TOMPKINS–HAWLEY–FULLER CO. v. HOLDEN.

(Circuit Court of Appeals, Second Circuit. April 6, 1921.)

No. 28.

1. Patents ⊂⊃328—Reissue patent, No. 13,749, for paper-making machine, held valid.

The Fuller reissue patent, No. 13,749, for improvements in paper-making machines, consisting of the addition to standard machines of means for conveying the moist paper from the press rolls to the driers, preventing breakage and increasing the daily production, *held* to disclose invention, and not anticipated.

2. Patents ⊂⊃35—Utility and extensive use evidence of patentability.

The evident utility of a patented device, the absence of other competing devices, and its extensive use is strong evidence of patentable merit.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Patents ⬥157(1)—"Drier," in application for patent on paper-making machine, held to mean only hot drum.**

The claims for a paper-making machine, consisting of the combination of press rolls, a drier, etc., *held* to use the word "drier" as meaning only a hot drum, and not a cold drum, which is not, properly speaking, a drier at all.

**4. Patents ⬥157(1)—Subject to general rules for construction of contracts.**

A patent is a contract made by the government's acceptance of the inventor's proposition contained in his application, and is subject to the same general rules of construction that apply to other contracts.

**5. Patents ⬥157(2)—Liberally construed in favor of inventor.**

Patents are liberally construed, so as to secure to the inventor the real invention which he intends to secure by his patent.

**6. Patents ⬥26(1)—Combination of known devices not patentable, if obvious, but otherwise may be.**

The aggregation of old and well-known devices is not patentable, if the combination claimed is an obvious one for attaining the advantages proposed, which would occur to any mechanic skilled in the art; but, if otherwise, it may be patentable.

**7. Patents ⬥26(2)—New results may be patentable, though successive steps not patentable.**

The product of a new result, which meets a recognized need and goes immediately into general use, may disclose invention, though there would be no invention in the adoption of any one of the successive steps by which the result was obtained.

**8. Patents ⬥16—Essential elements stated.**

The validity of a patent depends on novelty, utility, and invention.

**9. Patents ⬥328—Reissue patent, No. 13,749, for paper-making machine, held infringed.**

Infringement of the Fuller patent, No. 13,749, for improvements in paper-making machines, consisting of means for conveying the moist paper from the press rolls to the driers, *held* not avoided by disconnecting the steam pipes from the first of the series of driers and running it cold; it appearing that it was the practice in the trade to run the first drier either hot or cold, as the operator preferred.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Tompkins-Hawley-Fuller Company against Amos F. Holden, trading as the Little Falls Paper Company. From a decree dismissing the bill, plaintiff appeals. Reversed and remanded, with directions.

The plaintiff is a corporation organized under the laws of the state of Oregon, of which state it is a citizen. The defendant is a citizen of the state of New York, and has a regular and established place of business within the Southern district of New York. The suit is in equity for infringement of United States letters patent to Frederick H. Fuller, assignor by direct and mesne assignments to the Tompkins-Hawley-Fuller Company, a corporation. The patent is reissue No. 13,749, reissued June 16, 1914, and is for a paper-making machine. The original was No. 1,013,288, dated January 2, 1912, and application for reissue was filed August 21, 1913.

The complaint alleges that defendant has been and is infringing the reissued letters patent by manufacturing, using, and selling, or causing to be manufactured, used, and sold, certain new and useful improvements in paper-making machines, each of which contains and embodies the inventions described and claimed in the reissued letters patent. The complaint prays that defendant may be compelled to account for and pay over to plaintiff all the

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

profits made by him by reason of his unlawful acts and the damages which the plaintiff has sustained thereby, and that the actual damage assessed be increased to a sum equal to three times the amount of such assessment under the circumstances of the willful and unjust infringement by him.

The answer alleges that the plaintiff's patent is void, in that prior to Fuller's supposed invention, or more than two years prior to his application for his original patent, the alleged inventions or improvements referred to in the bill of complaint and in the reissued patent had been patented or described in certain specified United States letters patent, French letters patent, and German letters patent, and in other printed publications.

The learned District Judge thought the validity of the patent was open to question, but did not decide it, simply holding that there was lack of infringement. The bill was accordingly dismissed.

Edwin J. Prindle, of New York City (Warren H. Small, of New York City, of counsel), for appellant.

Walter D. Edmonds, of New York City (Philip C. Peck, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The patent in suit is for certain new and useful improvements in paper-making machines. The invention relates especially to machines for handling tissue or other thin papers, and is particularly applicable to what is known as the Harper-Fourdrinier type of machine, although also applicable to other paper machines, as, for example, to those of the cylinder type. The object of the invention is to prevent the pulp from sticking to the upper metal press roll of the paper-making machine and to cause it to be carried unbroken to the "driers."

[1] A paper-making machine consists of means for forming a sheet of paper from properly prepared pulp, or paper stock, extracting the water from the stock, pressing it, drying and smoothing the paper, and preparing the finished product for market sizes and requirements. Machines used for this purpose are tremendous pieces of mechanism, averaging 100 feet in length and 25 feet in width, and being 10 to 12 feet high. They weigh from 100 to 200 tons, and run at a speed of from 200 to 450 feet a minute. The pressure roller *22* of the patent in suit, which appears in the drawing in a subsequent part of this opinion and which looks so small itself, weighs approximately one ton.

The manufacture of paper appears to be an extremely difficult art. Those engaged in it describe it as such, and say that it required a great deal of skill, experience, and knowledge. The art of paper-making involves: (1) The shaping of the saturated pulp into a continuous sheet. (2) The drying of the sheet.

The ultimate stage of the shaping has long been accomplished by the aid of a coacting pair of rollers, known in the art as "press rolls," between whose compressive "bite" the pulpy sheet is pressed into its final thickness, and most of its water squeezed out; its cohesion and strength being thereby augmented. The sheet as it emerges from the press rolls is still so wet that it is fragile and industrially useless. The next step is to dry it, and this is done by bringing the sheet into progressive contact with one or more internally heated rotary cylinder drums, to which the sheet is transferred as directly as possible on its

emergence from the "press rolls," and thus brought into progressive contact with the hot peripheries of the cylinders or drums until it is sufficiently dehydrated or dried.

Standard paper-making machines comprise three main elements: (1) A forming wire or screen, on which the wet pulp is deposited. (2) Press rolls, to squeeze water from the wet pulp and compress or mat the fibers to form a web. (3) A series of drums, called driers, to complete the paper.

The patent in suit adds to these three standard parts an attachment for conveying the moist web from the press rolls to the driers. Heavy papers have sufficient strength to pass from the press rolls to the driers without difficulty. But light-weight paper, such as very thin tissue paper, does not have sufficient strength for that purpose. Prior to the invention in suit the web of wet paper had to be carried over by hand from the press rolls to the driers. This was a difficult thing to do, and to do it required skill and training. To accomplish it one had to move his hands at the same speed the machinery was going. In the process the paper was constantly breaking. The problem which the inventor had to solve was so to equip a paper-making machine that the web of thin tissue paper could be taken from the couch roll through the press rolls and onto the first of a series of driers automatically and without breaking the paper. This it is claimed Fuller succeeded in doing.

Claims 1 and 2 of the patent are illustrative and read as follows:

"1. In a paper-making machine, the combination of press rolls, a drier, a bottom felt, and a top felt, the bottom felt passing between the press rolls, the top felt passing from the upper press roll to and into contact with the drier, and another roll for pressing the top felt against the drier at or above the level of the axis of the drier.

"2. In a paper-making machine, the combination of a couch roll, press rolls, a drier, a bottom felt, and a top felt, the bottom felt passing around the couch roll and between the press rolls, the top felt passing from the upper press roll to and into contact with the drier, and another roll for pressing the top felt against the drier at or above the level of the axis of the drier."

The plaintiff offered in evidence a certified copy of the patent in suit, marked Exhibit 5, Figure 1 of which is here reproduced:

Figure 1 represents the Harper-Fourdrinier machine, with Fuller's attachment, which is the patent herein involved; and Fuller's testimony concerning it was as follows:

"Q. Did that machine have the felt *20* thereon when it first was set up on the floor and when you tried unsuccessfully to take a web of paper over it without breaking it? A. It did not.

"Q. Did it have the roller *22* thereon? A. It did not.

"Q. Did it have the hand lever *23* thereon? A. It did not.

"Q. Did it have all the other parts shown in this drawing? A. It had all the parts, except the support for the top felt *20* and these parts that you just specified, roll *22* and rod *23*.

"Q. Now, by reference to this same Figure 1 of the drawing and using the reference characters thereon, will you please explain just what you did to that machine so that it operated successfully without breaks? A. I took the gear off the drier *21*, put a drive pulley on the back end of bottom press *19* to drive this drier *21*, put a frame on top of frame *17* to carry felt *20*, which I put around top press *18* and around roll *22*, and put on a tension rod *23* for pressing this roll *22* against the overhang drier of a series of driers.

"Q. How did you connect the drive pulleys on drier *21* and press *19*? A. With a belt.

"Q. Did you add the roller *22*, or was that on the machine as it was delivered? A. I added it.

"Q. Was there any reason for having the roller *22* press against the drier *21*? A. To make the paper leave the felt and go onto the drier roll.

"Q. What do you mean by the drier roll? A. The overhanging drier of a series of driers.

"Q. What is the reference character attached to the drier to which you refer? A. Reference character *21*.

"Q. Is there any significance in the location of the roller *22* with reference to the axis of drier *21*? A. I don't understand your question.

"Q. The roller *22* is shown above the axis of drier *21*. Could roller *22* have been placed below the axis of drier *21* with equally satisfactory results? A. It could be placed anywhere on the drier above the center. I found it worked better right where I had it.

"Q. Was there any advantage in placing it above the center? A. It was more inclined to follow the drier than if it was down lower on the drier. Gravity helped along with the pressure.

"Q. Did the machine on which you placed your attachment in the summer of 1909 operate successfully thereafter? A. It did.

"Q. For how long? A. Still in operation."

## Fuller further testified as follows:

"Q. Please state the advantages which your invention has which apply to a paper-making machine. A. The greatest advantage is that you can run a thin sheet of paper and not have it break. Another advantage is that this increases the speed of the machine; you can use a poorer grade of stock.

"Q. What do you mean by stating that it increases the speed of the machine? Please explain a little more fully. A. You can run the machine at a faster speed. I have known machines before this attachment was put on make paper at the rate of 200 feet a minute. I know machines now that are running 450 feet with this attachment, and it would not be possible to do it without this attachment on.

"Q. Why is this so? A. Because the paper would break on the press; there is nothing to automatically carry it on to the first drier. In the other styles of machines it had to be carried from this press to drier over by hand. This was a very difficult job and the paper would break in two. With this attachment it is delivered automatically from the press to the first drier of a series of driers.

"Q. What ordinarily limits the speed of a paper-making machine of the kind to which you have referred? A. The ability to keep the paper over the machine.

"Q. By keeping the paper over the machine you mean running the paper without breaks. Is that correct? A. Yes."

The explanation given of the exhibit illustrating the Harper-Fourdrinier standard type of machine follows:

The wet pulp is contained in a head box *10* (near the center of the drawing at the bottom), from which it is spread on the straight top of an endless forming wire *11* (at the left of the drawing), from which it is taken off by an endless belt or felt called a lower felt *15* and conveyed to the press rolls *18, 19* (near the right of the drawing). A couch roll *16* keeps the felt in contact with the forming wire *11*. All this is old and standard practice, as well as the series of driers *21*, to which the pulp sheet passes from the press rolls *18, 19*. It was the practice before the present invention to have the upper press roll *18* bare and convey the paper by hand (when starting the machine) from the press rolls *18, 19*, to the first of the series of driers *21*. This is still standard practice for heavy papers, which have sufficient body and tensile strength to permit their being scraped from the upper roll *18* by a doctor knife, and then pass the gap to the first of the series of driers without danger of breaking. With very light tissue paper, however, the wet pulp sheet is so tender that it does not scrape readily from upper press roll *18* and breaks continually between press roll *18* and the first of the series of driers *21*. When the paper breaks at this point it is necessary to stop the machine and carry the paper on to the drier by hand or by a sheet of cardboard. This lowers the quality of the product, and also diminishes the output, as the machines must be run at a comparatively low speed, so that in case of a break the amount of paper wasted before the machine can be stopped will not be too great. Notwithstanding these disadvantages, this practice was common in the manufacture of tissue paper until the attachment of the patent in suit was placed on the market, although many attempts were made to overcome the difficulty. The practical attempts to overcome the difficulty consisted of various devices and modifications to upper press roll *18* to prevent the wet pulp sheet from sticking thereto.

The attachment of the patent in suit cured the difficulty by running an upper continuous band called an upper felt *20* between the press rolls and onto the first drier *21*, against which the felt was pressed directly by a pressure roller *22*. Pressure at this point by the roller is essential to make the paper leave the felt and stick to the first drier and the pressure of pressure roller *22* on the first drier *21* was made adjustable so that the pressure could be varied to suit varying conditions. The exact position of pressure roller *22* on first drier *21* is not essential, so long as the pressure roll *22* is above the center of first drier *21*. Its position is changed according to the particular work in hand. Some mills run first drier *21* hot and other mills run it unheated. It is obvious that with an unheated first drier the arc of contact which felt *20* makes with first drier *21* may be greater than if the drier is hot, as the heat bakes the felt and destroys its life. In case the machine is stopped, moreover, a hot first drier would injure the felt, which is prevented by having the first drier unheated.

Among the advantages of having pressure roller *22* above the center of first drier *21* is the aid afforded by gravity in causing the sheet of wet pulp to leave the felt and adhere to the drier and the benefit derived from having the pressure roller (which is more than 10 feet in length and weighs approximately a ton) supported throughout its length instead of by its ends only. When a roller of this size is supported only by its ends it tends to sag and tremble at high speeds and spring out of line, thus drawing the paper unevenly. Although the invention of the patent in suit added to a standard type of machine only the upper felt *20* and the pressure roller *22*, some of the claims cover these parts in combination with the parts with which they coact including the lower felt *15* and the couch roll *16* around which the lower felt runs, as the entire machine is made automatic thereby. The machine is so completely automatic with the attachment that in case a break does occur it is not necessary to stop the machine, as the broken end, no matter where it occurs, is carried over by the felt onto the first of the series of driers.

The invention has been a commercial success. The principal tissue mills of the country use it, paying royalties to the plaintiff therefor. The largest mill machinery builders in the world are licensees under the patent in suit. A number of the oldest, most experienced, and most

successful paper manufacturers in the country testified that the plaintiff's device is standard practice in paper mills making light-weight tissue paper, and that they did not know of any other device which was satisfactory. Their testimony shows that the device enables the machines to be operated at an increased speed of from 20 to 50 per cent., and that it accomplishes automatically a particular part of the work which previously had to be done by hand. A paper manufacturer of 40 years' experience, the president of the Victoria Paper Mills Company, which operates its plant night and day 6 days in the week, testified that all the machines in his plant had been equipped with the plaintiff's device, which he began to use 4 years before, and that he did not know of any device which would work as satisfactorily as the device of the patent. He was asked whether it was standard practice, and answered: "Yes; I do not know of anything else." He was corroborated by other witnesses of almost as wide an experience. There is no testimony in the record which contradicts them. There can be no doubt as to the utility of the device.

[2] The courts hold that it is not essential to patentability that an invention should be the best of its kind. Lamb Knit Goods Co. v. Lamb Glove, etc., Co., 120 Fed. 267, 56 C. C. A. 547; Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 845, 48 C. C. A. 72; Wheeler v. Clipper Mower, etc., Co., 10 Blatchf. 181, Fed. Cas. No. 17,493. But the record in this case makes it evident that prior to this device there was no way of running a thin sheet of paper through the machines without having it break at the press rolls, and it had to be carried over by hand. This device obviated both difficulties. The paper did not break, the device operated automatically, and the speed of the machines was increased from 20 to 50 per cent. Its evident utility, its absence of other competing devices, and its extensive use strongly attest its patentable merit. Lorillard v. McDowell, 15 Fed. Cas. 893, No. 8,510.

[3] The court below held that the plaintiff failed on the issue of infringement for two reasons: (1) Because he thought that Fuller probably meant by "drier" only a hot drum. (2) Because, if Fuller meant to include a cold drum, his patent would have been invalid. We have no way of judging Fuller's intentions, except by what he said. In an application for a patent, and basing it upon a specification which the applicant declares to be "a full, clear, and exact description of the invention," we think that the inventor has clearly indicated his intention by the language he has used, and that no reason really exists for speculating as to what he meant by what he said.

[4, 5] A patent is subject to the same general rules of construction that apply to other contracts; for a patent is a contract made by the acceptance by the government of the proposition made by the inventor in his application. O. H. Jewell Filter Co. v. Jackson, 140 Fed. 340, 72 C. C. A. 304. Patents are to be liberally construed, so as to secure to an inventor the real invention which he intends to secure by his patent. There are cases in which an element described in the specification of a combination or device claimed has been read into the claim from the specification. This court has held that the specification may be

referred to for the purpose of limiting, though not of expanding, a claim. Fowler & Wolfe Mfg. Co. v. McCrum-Howell Co., 215 Fed. 905, 132 C. C. A. 143. And in a number of cases the Supreme Court has sustained the validity of a patent which otherwise might have been invalid by importing into the claim the particulars of the specification. See Seymour v. Osborne, 11 Wall. 516, 547, 20 L. Ed. 33; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 538, 18 Sup. Ct. 707, 42 L. Ed. 1136; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 432, 22 Sup. Ct. 698, 46 L. Ed. 968. But neither in the specification nor in any one of the claims is anything said which indicates that the applicant meant by "drier" something which was not a drier, but a cold drum. A drier is defined in the Century Dictionary as:

"A machine or mechanical contrivance or apparatus used in removing moisture from some substance."

The following is an excerpt from the testimony:

"Q. What is the term 'drier' in paper-making machines? A. The term 'drier,' as used by paper makers, has always signified a drying cylinder with steam connections in the inside and a web of paper passing around the circumference of the drier, which is dried by coming in connection with the hot cylinder."

In view of this testimony we think it sufficiently appears that a cold drum is not a "drier," and that the drum to be a drier must be hot. Fuller not only "probably meant by drier only a hot drum," but he could not have meant anything else than a hot drum, as a cold drum is not, properly speaking, a drier at all. In a subsequent part of his specification Fuller uses the following language:

"In addition to the marked advantages of preventing the paper from sticking to the upper press roll and carrying it on the under side of the top felt immediately to the first drier, I secure also the advantage of using a common and familiar equipment, while at the same time obtaining the full benefit of the first drier by carrying the paper in contact with a large part of its area. In fact, the paper as it passes up from the press rolls hugs the adjacent portion of the circumference of the first drying cylinder, before it passes over the upper and outer part of the circumference, or, in other words, first contacts with the drier and leaves it at substantially diametrically opposite points, or at points below the line of a horizontal diameter of the drier."

The "full benefit of the first drier" must mean the exposure of the web to a large area of hot surface of the "drying cylinder," as there could be no benefit in its exposure to a cold surface of the cylinder. The Fuller attachment includes a series of driers, and some manufacturers at times run the first of the series cold with certain kinds of paper. But when it is run cold it is not acting as a drier, and is not rendering the service for which driers are devised.

The prior art patent mainly relied upon to defeat the validity of the patent in suit, and the only one which needs to be considered in this connection, is that issued to Tompkins & Barnes, No. 668,068, dated February 12, 1901. The object of that invention, as stated in the specification, was to provide certain improvements in paper machines—

"whereby the same may be rendered more efficient and capable of doing better work and with less manual labor or attendance."

The Tompkins & Barnes patent was acquired by the plaintiff in November, 1912, upon its organization. The plaintiff's articles of incorporation were filed in the office of the secretary of state of Oregon on November 23, 1912. Its articles state that—

"The object, business, enterprise and pursuit of this corporation shall be the acquisition and ownership of the Tompkins-Barnes patent, No. 668,068, patented February 12, 1901, and the Fuller-Hawley patent, No. 1,013,288, patented January 2, 1912, and to combine the above-named patents, together with any other improvements upon the invention represented by said patents pertaining to the automatic handling or treatment of sheet-paper on papermaking machines, and generally to engage in the manufacture, lease, and sale of paper-making machinery and devices pertaining to the manufacture of paper."

This Tompkins-Barnes patent expired on February 12, 1918. The bill of complaint was filed and the present suit commenced on June 29, 1918. The defendant intimates that the suit is an attempt unwarrantably to extend the monopoly possessed by the plaintiff under this Tompkins-Barnes patent. Whether the attempt is or is not unwarrantable must depend on whether the first patent was an anticipation of the second. The fact that the plaintiff owned both patents is altogether irrelevant. Neither does it illuminate the matter any to be informed that, as the life of the first patent has expired, the plaintiff seeks to prolong his monopoly through the second patent. This, of course, the plaintiff has a perfect right to do, if its patent is valid.

Prior to the Tompkins-Barnes patent there had been a number of attempts to remedy and prevent the breakage to which the web of pulp was liable in its passage between the press rolls. The Bingham patent, No. 58,051, dated September 18, 1866, stated that as the object of the invention of that patent, and it consisted "in a novel arrangement of two felts and four press rolls with doctors inside of the felts." Hoeborn, who had taken out his patent in 1887 in Germany, and later in England, in France, and in Belgium, and who filed his application in 1889 in the United States Patent Office, had the same object in mind, and claimed that his machine made it possible to manufacture paper of all kinds of materials and of any desired thickness, varying from the thickest cardboard to the thinnest tissue paper. He used a second felt, brought directly to the drier by a roll. So did La Croix and Paquet, under German patents, and Du Pont, under French patents.

In the Tompkins-Barnes patent and in the Fuller patent there are two felts in both, and the paper is between these two felts in both, and passes between the two press rolls, the same in each, and the paper sticks to the upper felt. In these respects there is no difference between the two patents. But there is a difference as regards the separation of the paper from the upper felt when the time comes to separate it. Separation in the Tompkins-Barnes patent takes place on a lower roll in a different way from that in the Fuller patent. In the Tompkins patent the point of contact is more acute and the paper more often breaks, whereas in the Fuller patent the contact is more obtuse and is easier on a tender, wet sheet, and so can be used with a different degree of safety to the sheet. The inventor, Mr. Tompkins, was asked as follows:

"Q. Mr. Tompkins, will you please explain to the court what is the difference, if any, between this patent of yours, No. 668,068, and the Fuller patent in suit now, as regards the protection of the paper as it passes between the press rolls as against breakage or otherwise? In what respect does your own patent and this device for that differ from the Fuller patent in suit? A. The two felts run between the two press rolls, and the paper always sticks to the upper felt. That it does in both instances.

"Q. There are two felts in both cases, and the paper is between those two felts in both cases, and passes between the two press rolls the same in each, does it not? A. Yes.

"Q. And that is a good arrangement for protecting the paper from any injury from the upper press roll, is it? A. Yes.

"Q. Now, further comparing the two patents mentioned in my last question, what difference is there between their respective devices as regards the separation of the paper from the upper felt when the time comes to separate it? A. Separation takes place on a lower roll in a different way from the Fuller roll, for the reason that it was harder on the small circumference, the point of contact was more acute and it would sometimes break; whereas the Fuller contact is more obtuse and it is easier on a tender, wet sheet, and it can be used with a different degree of safety to the sheet."

In applying his invention to an existing machine Mr. Tompkins added two rolls, and Mr. Fuller in his attachment only one. The lower of the Tompkins rolls, being supported on the extreme ends of the bearings, did not always run true and without sag. The Fuller attachment obviated that difficulty. Mr. Tompkins was asked:

"Q. Does the Fuller attachment of the patent in suit obviate that difficulty? A. It does.

"Q. How? A. By having a greater diameter, and the roller lays on a smoother surface on a drier 4 feet in diameter or more; the entire length has a bearing. It has the support of the drier itself, so that there is no chance of sagging.

"Q. That is, in your attachment the bottom roller is supported only at the ends? A. That is all.

"Q. While in the Fuller attachment the roller is supported throughout its length? A. Yes; it has a smoother, more uniform bearing for the entire length.

"Q. And the result of the uniform bearing is what? A. The uniform bearing gives the result that the sheet is turned out without injury and without drawing any part of it. It has a uniform bearing and a uniform pressure."

The following is a further excerpt from the testimony of Tompkins, the patentee, concerning his patent:

"Q. Will you please state whether you made any attempt to introduce this device into use in the mills? A. We took a great deal of pains to show it to visitors that came to us, and we had some correspondence about it. We tried to introduce it, and continued to do that from the time the device was put on in 1897, in August, in Mr. Barnes' mill, and in September, in my mill, until 1901, when the patent was issued. We did not succeed in interesting the first mill to put on the attachment.

"Q. Did you advertise it? A. It was noted in the paper trade journals. * * *

"Q. Do you know of any mill which ever adopted or used this invention? A. I never heard of but one, and that was mentioned in the record by the defendant, and was noted in an article in a paper trade journal by some one in Ohio. That was the only one I ever heard. I bought Mr. Barnes' interest in the patent in 1901 and owned it thereafter myself, and I endeavored to put it on the market at that time; but I never could succeed in getting a man to put it on the machines.

273 F.—28

"By the Court: Q. What was the trouble with it, Mr. Tompkins? A. Well, it worked nicely in a way. The introduction of a false doctor was necessary. It was not automatic, only to the doctor on the lower roll, and there the attendant would draw back the false doctor and let it drop onto the drier.

"Q. You mean the doctor lying on the drier? A. From the bottom of the lower press roll. That needs the attention of an attendant, and there was more or less water dripping from the lower roll, it being an iron roll, and that sometimes would drop on the sheet and blotch the sheet, so that Mr. Barnes, when he first started it, while the sheet would run perfectly, it would run as though it had smallpox, just the little drips of water dropping here and there all over the sheet. Commercially it spoiled the sheet, until we put on the false doctor.

"Q. The element $T$? A. To catch the drippings from the doctor itself, which caused defects, and ward it off and drop it on the floor, and these little defects did not appeal to the public.

"Q. When you put on the element $T$, which you called the false doctor, it obviated the dripping? A. Yes, sir.

"Q. I do not quite get the function of the doctor and how it works here. As I understand, it is to scrape the condensed water or the carried water from the paper rolls, so that as the roll goes up to engage the new webbing it shall be dry, relatively; is that right? A. In a sense. The doctor was to prevent this winding also on the lower roll.

"Q. Prevent what? A. To prevent the sheet, the web of paper, winding on the lower roll. It had to be there to prevent that.

"Q. It would not do that unless it broke? A. It would not do that unless it broke, and in taking the end when starting the machine. When you first took the end over it would, and then it was put off by hand onto the lower drier, and it might be in a crippled condition, which caused it to be crinkly, and the speed of the lower drier was faster than the upper roll, in order to take up the stretch at that point. After a time it would straighten out and run smooth.

"Q. Before you put on the false doctor, as I understand, it worked in this way, when the sheet was in a broken condition the real doctor $U$ would be in contact with the lower roll and the doctor would therefore keep scraping off the moisture which gathered on the lower roll, and that moisture would fall down onto the web? A. Onto the back side of the web. It would be dirty water.

"Q. You put on the element $T$, which you call a false doctor, which bore off that water to the rear of the machine, and that obviated the difficulty? A. That is just right.

"Q. After you had done that, did it work well after that? A. It worked fine. It worked all right.

"By Mr. Small: Q. Was it automatic? A. It was not automatic in taking it to the drier, only to the bottom of the lower roll."

This excerpt tells the story and makes extended criticism unnecessary. The Tompkins patent is not automatic and has not been used by the trade. It did not anticipate the patent in suit, the device of which works automatically. There is no other device than the patent in suit which satisfactorily accomplishes the result.

The purpose of both the Tompkins and Fuller devices was to prevent the breaks in the web of tissue paper at the press roll. Tompkins failed to accomplish that result, and besides his machine was not automatic. Fuller accomplished the result, and did it in a manner entirely satisfactory to the trade, and with a machine which is automatic. We are at a loss, therefore, to see how it can be said that the Barnes or Tompkins device anticipated the Fuller device.

[6] A mere aggregation of old and well-known devices may or may not be patentable, depending upon the circumstances of the particular

case. If the combination claimed is an obvious one for attaining the advantages proposed, and one which would occur to any mechanic skilled in the art, it would not be patentable; and, if otherwise, it may be. In the leading case of Loom Co. v. Higgins, 105 U. S. 580, 591 (26 L. Ed. 1177), the law is stated as follows in respect to a mere aggregation of old devices:

"* * * This argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed, one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. Who was the first to see it, to understand its value, to give it shape and form, to bring it into notice and urge its adoption, is a question to which we shall shortly give our attention. At this point we are constrained to say that we cannot yield our assent to the argument that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention. Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly a new and useful result to make a loom produce 50 yards a day when it never before had produced more than 40; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

[7] And the production of a new result which meets a recognized need and goes immediately into general use is held to disclose invention, though there would be no invention in the adoption of any one of the successive steps by which the result was attained. American Steel Foundries v. Damascus Brake Beam Co., 267 Fed. 574.

There is no device of the prior art which is precisely similar. Patentable novelty may reside in the particular means used for accomplishing an old result. It may also lie in the use of old means in a new relation to produce a new result. The essence of the Fuller invention is the repositioning of the Tompkins roll. The patent in suit used old means in a new relation to produce a new result. The fact proves that the claims cover a "novel" structure. The evidence is uncontradicted that the attachment of the patent has become standard practice. It is shown to be "in fact the only attachment or device on the market for the purpose for which it is used." The fact proves that the claims cover a "useful" structure.

The evidence clearly establishes the fact that results are obtained under the structure of the patent which were never obtained before under any structure of the prior art. It dispensed with "an endless amount of breaks at the press rolls, which occasioned loss of production." It caused "fully 20 per cent. increase" in the daily production of the machine on tissue paper, and increased the speed of the machine from 20 per cent. to 50 per cent. To accomplish this result, even by a combination or rearrangement of old elements, affords sufficient evidence of "invention" to form the basis of a patent.

[8] The validity of a patent depends upon novelty, utility, and invention, and in the opinion of the majority of the court the patent in suit shows novelty, utility, and invention, and is therefore valid.

[9] This brings us to the question of infringement. We discover no real difference between the defendant's machine No. 3 and that of the patent in suit. In the defendant's machine the press rolls are coupled directly to the first of a series of standard driers in the same manner as in the Fuller device, but it is sought to avoid infringement because defendant disconnects his steam pipes from the first of the series of driers. The argument is that, when the steam is disconnected, the first drum is not the first of a series of driers. The practice of the trade shows that it is quite usual among those who use the Fuller attachment to run the first of the series of "driers" cold. They run the first cylinder without steam, in order to improve the paper and protect the felt, as the less pressure and heat one has on the driers the better the strength of the paper. As the first drier is run either hot or cold, as the operator prefers, one cannot avoid infringement by merely disconnecting the steam pipes from the first drier and running it cold. A valuable contribution to an art is not to be destroyed by mere artifice and evident evasion.

The decree of the District Court is reversed, and the cause remanded, with directions to reinstate the bill and take such further action as may be necessary, not contrary to this opinion.