**BALTIMORE PAPER CO. et al. v. OLES ENVELOPE CO.**

No. 2263.

District Court, D. Maryland.

March 9, 1936.

Albert Charles Nolte and James N. Catlow, both of New York City, and J. Kemp Bartlett, Jr., of Baltimore, Md., for plaintiffs.

George A. Rockwell and George N. Goddard, both of Boston, Mass., and Thomas W. Y. Clark, of Baltimore, Md., for defendant.

COLEMAN, District Judge.

This is a suit for infringement of a patent on an envelope making machine issued to A. Winkler and M. Dunnebier, November 15, 1921, No. 1,396,906, application for which was filed November 20, 1919. Plaintiff Baltimore Paper Company is the present owner of this patent, and the other plaintiff, the F. L. Smithe Machine Company, is the exclusive licensee. The defendant corporation denies infringement and also asserts invalidity of the patent, on the ground of (1) inoperativeness, and (2) anticipation by the prior art.

As stated in the specifications, the invention "relates to improvements in machines for manufacturing envelopes, the principal object of the invention being to provide, in combination with a roller folding machine, an improved gumming apparatus, the output of which is equal to that of the roller machine, whereby the high efficiency of the latter machine can be made use of in such combined machine." Further objects of the invention are defined, but without quoting from the patent, the main object sought to be attained by this patent may be described in nontechnical language as the dispensing with any manual labor in connection with making the envelope from the first to the last operation, namely, from the time when the sheet of paper, out of which the envelope is made, is introduced into the machine, the closing flap is gummed, the gum is dried, the other flaps are folded and sealed, until the completed envelope is finally released.

Claim 2, the only one in issue, is as follows: "In a machine of the class described, the combination of a folding mechanism, a gumming mechanism, means for feeding blanks first to said gumming mechanism in overlapping relation, a drying chamber, means for conveying said blanks from said gumming mechanism through said chamber, means for separating the blanks after their passage through the drying chamber and delivering them individually to the folding mechanism, and means between said delivering means and folding mechanism for restraining successive blanks while a blank is entering the folding mechanism."

Separating the integral parts of this claim, it may be said to provide for three primary mechanical functions: (1) Gumming; (2) drying; and (3) folding. To carry out these functions, the following means are provided to operate in the following sequence: (1) Means for feeding the paper sheets in overlapping relation, to (2) a gumming mechanism, to (3) a drying chamber; (4) means for conveying the pa--

per sheets through this chamber; (5) means for separating them after their passage through this chamber, and putting them in proper spaced position for delivery to the folding machine; (6) means for delivering them to the folding machine; and (7) means for folding and sealing them, and releasing them in the finished state.

Plaintiffs do not claim that there is any novelty either in the gumming device, the drying device, or the folding device embodied in their machine. On the other hand, it is their position that their patent is not, as defendant claims, the mere juxtaposing of a prior art gumming machine with a prior art folding machine in synchronization with each other.

Envelope-making machines are of two kinds, speaking broadly: First, the plunger type, and, second, the rotary type. Again, speaking broadly, the primary distinction is that in machines of the first type, the folding of the sides and bottom of the sheet is done while the gum on the closing flap is wet, whereas in machines of the second type, the folding is done after the gum of the closing flap has been dried. The history of the art shows that for a long period of time prior to the application for the patent in suit, the sequence of gumming, drying, and folding was well known, and that it had long been customary to apply the gum by one machine to that part of the sheets which formed the closing flaps of the envelopes; then to run them through a dryer, and thereafter to transfer them, by hand, to a folding machine where the permanently sealed flaps, that is, the sides and bottoms, were gummed and folded down, and where, also, the previously gummed and dried closing flaps were folded down. That is to say, the sheets, after the closing flaps had been mechanically gummed and dried, were fed on to a table, from which they were required to be removed, and restacked by hand on another table, from which they were fed into the folding machine. The prior gumming and drying of the closing flaps, characteristic of the so-called rotary machine method, made it possible to speed up the output and to improve the finished product. Among the advantages, separation, at the close of the folding process, for the purpose of drying the gum on the closing flaps, required under the so-called wet or plunger method, was obviated; that is, the finished envelopes could be immediately stacked,

under pressure. Also, curling of the gummed closing flaps was thus obviated.

There had been various unsuccessful attempts to produce a workable machine combining, without manual labor, the two operations of gumming and then folding. The efforts of one Staude in 1912, and of one Novick the following year are conspicuous. The former obtained a patent (No. 1,144,506, issued June 29, 1915, to Edwin G. Staude). However, this was not a combination device, but merely a folding machine for a dry blank which could be gummed as to its closing flaps either before or after the folding. Novick also obtained a patent (No. 1,121,125, to Abraham Novick, December 15, 1914), but in his device the sequence in operations was reversed, that is, the gumming and drying of the closing flaps· followed, instead of preceding the folding operation, and there was the additional, very material distinction in that the sequence of operations ended with the closing flap still extended, not folded.

Finally, the combination embraced by the patent in suit eliminated the gathering of the blanks on the delivery table and the restacking of them on the feed table. This is accomplished by a slow-moving belt which conveys the overlapped series of blanks to a rapidly rotating pull-out wheel, that is, the blanks are made to travel in proper spaced relation, one to the other, and are accurately timed so as to synchronize with the operations of the folding mechanism. Thus it will be seen that the patent in suit involved the combining of two machines, old in the art, which had previously been connected by hand operations, into a unitary mechanical system.

There is no evidence, nor is it contended by defendant, that there had ever existed in the prior art the combination of a unitary machine in which the blank sheets were (1) gummed and dried, and (2) folded; but defendant's contention is that such could have been done under the prior art, and would have been merely an aggregation which is not patentable, because the synchronization of the two mechanisms was a mere matter of mechanics within the power of any skilled artisan and not rising to the position of an invention.

Taking up, first, the question of infringement, a comparison of the parts and the functioning of the defendant's machine with the parts and functioning of the plaintiffs' machine, clearly indicates that there is

no material difference. First, the rollers provided in defendant's machine for producing the overlapping are substantially the same as those in plaintiffs' machine, except they are constructed for wider spacing, but this is reduced in the next operation. Second, the sheets are run through a gum-trough in the same manner as in plaintiffs' machine. Third, defendant's machine uses a chain as a conveyor while plaintiffs' uses a belt, but this is not a material difference. Then follow drums and conveyors which correspond to, and operate the same as the drums and conveyors on plaintiffs' machine. Next, the pull-out roller or wheel on the one machine corresponds to the other. Defendant's roller has a smooth surface except for rubber plugs, which correspond to, and perform exactly the same function as the recessed surface of plaintiffs' roller. Lastly, as the blanks are pulled out and projected towards the folding mechanism, they are held in place in the defendant's machine by a series of springs which frictionally clamp them and hold them back until pins seize them and advance them. On plaintiffs' machine pivoted fingers correspond to and perform the same function as the springs in the defendant's machine. Evidence was introduced of another machine (of the defendant) with some of its parts somewhat differently constructed, but the differences are all minor, and do not in any way materially alter the method or sequence of the various functions that are performed.

The testimony introduced by defendant to contradict the similarity of the machines of the defendant and that of the patent in suit is not convincing. In fact, defendant appears rather to stress its claim of invalidity, on the ground that the construction called for by the patent specifications is absolutely inoperative; that the plaintiffs have never built such a machine, and cannot build one that will be commercially successful. However, this testimony appears to be conclusively refuted by the testimony of the vice president and factory manager of one of the plaintiffs, the F. L. Smithe Machine Company, licensee of the patent, to the effect that under the patent in suit and under related improvement patents 160 of plaintiffs' machines have actually been built and sold since 1928, worth on the basis of sales prices, $1,125,000; that it has paid approximately $190,000 in royalties to the other plaintiff, the Baltimore Paper Company, on these machines; and that the machines have met with great commercial success. It is further significant that the demand for the plunger type of machine made by this company has rapidly declined since it began, in 1928, to construct the rotary type, until at the present time there is little demand for the former, which are capable of producing not over 170 envelopes per minute, whereas the rotary type can produce as many as 500 per minute.

Defendant's attempts to prove the inoperativeness of the structure disclosed in the patent are not persuasive. There is abundant testimony that it is operative. The grant of a patent carries with it a presumption that this is so. Knowledge after the event is always easy. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527. Also, an infringer is not permitted to deny the utility of the invention infringed. Westinghouse E. & Mfg. Co. v. Wagner E. & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A. (N.S.) 653.

We come, then, to the question whether the patent in suit is void for anticipation. It is clear that it is not anticipated by any patent that has been cited. Only two such patents need be here referred to, because the others cited cover machines of radically different construction and operation. These two are the patent to E. G. Staude, which has previously been analyzed and shown not to be a combination device, and therefore not an anticipation; and the patent to C. F. Pflanze, No. 1,385,468, issued July 26, 1921, application filed November 23, 1917.

The Pflanze patent, No. 1,385,468, was issued before the patent in suit. Also, application for the Pflanze patent was filed (November 23, 1917) before the application of the patent in suit was filed (November 20, 1919), although the Pflanze patent was not actually issued (July 26, 1921) until after the Winkler and Dunnebier application was filed. Defendant claims that, therefore, the Pflanze patent may be cited in the present suit as prior art; whereas plaintiffs contend that although it may be used to show priority of invention, since prior invention is not here claimed by defendant, but merely that the object sought to be attained by the patent in suit can be obtained by a combination of inventions old in the art, it may not be used to show the state of the prior art embracing those separate inventions. With plaintiffs' contention we agree. The defense of prior art rests on disclosure. There could be

no disclosure to the plaintiff of defendant's application while pending in the Patent Office. But the defense of prior invention rests on actual first conception of the idea. In other words, in order for the prior applicant to be the first inventor, his patent application must actually disclose the thing patented to a later applicant. Such was the holding in Stelos Co. v. Hosiery Motor-Mend Corporation (C.C.A.) 72 F.(2d) 405, based upon what we understand to be a proper interpretation of the rule laid down by the Supreme Court in Milburn Co. v. Davis, etc., Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

In any event, the Pflanze machine is clearly distinguishable from, and, therefore, does not anticipate, the patent in suit, for the following reasons: While it has the equivalent of the segmented rollers of the patent in suit, it has no overlapping "feed" feature, and each individual sheet is entirely discharged before the next one is engaged. Also, there is high speed operation at the start, and the overlapping of the sheets does not commence until later, at slow speed. Furthermore, there are no belts called for by this patent on the feed table.

Summarized, the basis of defendant's contention is that, granting the claimed distinctions exist between the patent in suit and the Staude and Pflanze machines, nevertheless, a commercially successful combination device could have been produced by merely juxtaposing a gumming machine of the type shown in a patent introduced in evidence to William C. Pelatt, January 22, 1889, No. 396,594, or in the Pflanze patent, with the Staude folding machine, by depositing the output of such gumming machine, that is, the overlapped series of sheets, into the feed-hopper or table of the Staude folding machine, by merely letting these sheets slide down this table into position where they would be engaged by the Staude folding machine feed-wheel. However, we accept as more credible on this point, the testimony of Mr. Staude, the inventor of the Staude feeding machine, to the effect (1) that the machine of the Pelatt patent is incapable of synchronization as proposed with the Staude machine, because the former depends on the combing action of a feed-wheel which delivers an indeterminable quantity of blanks per revolution; (2) that the machine of the Pflanze patent, likewise, could not be successfully synchronized, without the elimination of the delivery-table and the substitution of a slow moving conveyor-belt; and (3) no device would be commercially dependable which would rely merely on gravity to propel the sheets, with proper sequence of overlap, down the feed table into position to be fed by the feed-wheel of the Staude machine. This is confirmed by the highly convincing testimony of inventors Novick and Pflanze; and of Mr. Harry F. Affelder, vice president and general manager of the Wolf Envelope Company of Cleveland, and president of the Wolf-Detroit Envelope Company of Detroit, whose plants have a combined daily capacity of three and a half million envelopes.

In this connection, there is in evidence a blue print made in 1912 which shows the con-joint action of a gumming machine with the Staude folding machine. But there is a delivery table on the gumming machine and a feed table on the folding machine, which clearly indicates that Staude, although the opportunity of mechanically combining the two machines and thus eliminating the manual operation of removing the envelopes from the table of the gumming-machine and restacking them on the feed table of his own machine, was directly presented, nevertheless, did not conceive or use such combination. The admission that the arrangement called for by the blueprint, and which was tried, was abandoned because the gumming machine, in and of itself, was a failure, does not, we think, add any force to defendant's contention that what Staude did is corroborative evidence of the assertion that by mere juxtaposition of machines known to the prior art, precisely the same results would have been obtained as are urged for the patent in suit. On the contrary, this would appear to be highly persuasive of plaintiffs' contention that until 1919, when, through the patent in suit, the synchronization of the two operations was mechanically accomplished, no one had ever in fact done the same thing without the interposition of a manual operation. It is in evidence that as many as 30,000 to 40,000 sheets are gummed per hour on a single gumming machine, which would result in a pile or stack accumulating to great height in a few minutes time.

Having thus concluded that the patent in suit is operative, and not anticipated by any prior patent, there remains to be considered whether, as defendant contends, it is nevertheless invalid because amounting

to a mere aggregation of units old in the art, as opposed to a combination of such units producing a method of manufacture materially different from any known before the issuance of the patent in suit.

■■ A mere aggregation of old elements is not patentable, but a combination of them may be, provided the combination accomplishes some new result. The rule is thus clearly stated in Richards v. Chase Elevator Co., 158 U.S. 299, at page 302, 15 S.Ct. 831, 833, 39 L.Ed. 991: "Unless the combination accomplishes some new result, the mere multiplicity of elements does not make it patentable. So long as each element performs some old and well-known function, the result is not a patentable combination, but an aggregation of elements."

In the present case, defendant contends, as we have seen, that plaintiffs' patent involves nothing but the mere juxtaposing of a prior art gumming machine with a prior art folding machine, the one being synchronized with reference to the other by means of transfer belts which it is claimed do not perform any operation upon the blanks themselves, but merely convey them from the gumming machine to the folding machine in substantially the same order and arrangement; or that in any event, such order and arrangement as may be given to them in the transfer is not novel or necessary or uniform, and that it need not be uniform because the real synchronization is accomplished at a later stage, that is, when the blanks are run in spaced relation into the folding machine itself. Defendant stresses the decision of the Circuit Court of Appeals for the Fourth Circuit in Demco, Inc., v. Doughnut Machine Corporation, 62 F.(2d) 23 (certiorari denied 288 U.S. 605, 53 S.Ct. 396, 77 L.Ed. 980), in which that court, on an appeal from this court [51 F.(2d) 364], held void, for lack of invention, certain claims in a patent for automatically frying doughnuts which involved the combination of a doughnut former with a cooking machine. The court said, 62 F.(2d) 23, at page 26: "We understand that no contention is made that the use of the doughnut former alone would constitute an infringement of the Bergner patent. The contention is that the use of the former in connection with the cooking machine, so geared as to deposit doughnuts at definite intervals in accordance with the capacity of the cooking machine, is protected by the patent. But this is mere aggregation. Powers-Kennedy Corporation **v.**

Concrete Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L.Ed. 278; Victor Cooler Door Co. v. Jamison Cold Storage Door Co. (C.C.A. 4th) 44 F.(2d) 288; Heald v. Rice, 104 U.S. 737, 26 L.Ed. 910; Hailes v. Van Wormer, 20 Wall. 353, 22 L.Ed. 241. It did not constitute invention to equip a cooking machine with a previously known doughnut former. As to the synchronization of the two, this was a mere matter of mechanics, not beyond the powers of any skilled artisan. In so far, therefore, as the claims of Bergner patent No. 1,492,541 relate to the combination of the doughnut former with the cooking machine, they are void for lack of invention. The same is true with respect to claim 51 of this patent in so far as it relates to the location of the driving machinery beneath the grease receptacle. This was not invention but a mere matter of mechanical skill. Smith v. Springdale Park, 283 U.S. 121, 123, 51 S. Ct. 368, 75 L.Ed. 878." See, also, Doughnut Machine Corporation v. Joe-Lowe Corporation (C.C.A.) 67 F.(2d) 135; Id. (C.C.A.) 71 F.(2d) 423.

Plaintiffs seek to distinguish this case by arguing that the cycle of operations in the two cases is different, evidenced by the fact that in the case before us a new mechanical operation, namely, the conveyance of the blanks from one machine to the other is substituted for the old hand-gathering of the blanks before they are started into the folding machine. In other words, it is contended that whereas, in the prior art, the blanks were gummed and dried, then delivered out of the gumming machine, manually formed into stacks and started into the folding machine, under the patent in suit, after the gumming and drying, the stacking operation is entirely eliminated; in short, that a situation parallel to that in the doughnut case would exist if the patent in suit had provided a delivery table at the outward end of the gumming machine where something that corresponded to the operation of the human hand, gathered up the blanks, then carried them and assorted them for admission to the folding machine.

Plaintiffs liken the device of the patent in suit to that involved in the case of Tompkins-Hawley-Fuller Co. v. Holden (C.C.A.) 273 F. 424. There, two paper making machines were used in tandem; (1) a machine which formed the pulp into a continuous sheet and (2) a drying machine. The wet pulp, after being formed into a

continuous sheet, was conveyed by an endless belt or felt to press rolls where the water was squeezed out of the pulp, and after emerging from these press rolls, the sheet was conducted over heated rolls which dried it. Both sheet-forming and sheet-drying machines were old in the art. The court (C.C.A.2d) nevertheless found that the patent constituted not merely an aggregation of old elements but a combination which was patentable. The court said (273 F. 424, at pages 426, 427–430–434, 435):

"The manufacture of paper appears to be an extremely difficult art. Those engaged in it describe it as such, and say that it required a great deal of skill, experience, and knowledge. The art of paper-making involves: (1) The shaping of the saturated pulp into a continuous sheet. (2) The drying of the sheet. * * *

"Prior to the invention in suit the web of wet paper had to be carried over by hand from the press rolls to the driers. This was a difficult thing to do, and to do it required skill and training. To accomplish it one had to move his hands at the same speed the machinery was going. In the process the paper was constantly breaking. The problem which the inventor had to solve was so to equip a paper-making machine that the web of thin tissue paper could be taken from the couch roll through the press rolls and onto the first of a series of driers automatically and without breaking the paper. This it is claimed Fuller succeeded in doing. * * *

"The courts hold that it is not essential to patentability that an invention should be the best of its kind. * * * But the record in this case makes it evident that prior to this device there was no way of running a thin sheet of paper through the machines without having it break at the press rolls, and it had to be carried over by hand. This device obviated both difficulties. The paper did not break, the device operated automatically, and the speed of the machines was increased from 20 to 50 per cent. Its evident utility, its absence of other competing devices, and its extensive use strongly attest its patentable merit. Lorillard v. McDowell, 15 Fed.Cas. 893, No. 8,510. * * *

"The Tompkins patent is not automatic and has not been used by the trade. It did not anticipate the patent in suit, the device of which works automatically. There is no other device than the patent in suit which satisfactorily accomplishes the result.

"The purpose of both the Tompkins and Fuller devices was to prevent the breaks in the web of tissue paper at the press roll. Tompkins failed to accomplish that result, and besides his machine was not automatic. Fuller accomplished the result, and did it in a manner entirely satisfactory to the trade, and with a machine which is automatic. We are at a loss, therefore, to see how it can be said that the Barnes or Tompkins device anticipated the Fuller device.

"A mere aggregation of old and well-known devices may or may not be patentable, depending upon the circumstances of the particular case. If the combination claimed is an obvious one for attaining the advantages proposed, and one which would occur to any mechanic skilled in the art, it would not be patentable; and, if otherwise, it may be. * * *

"And the production of a new result which meets a recognized need and goes immediately into general use is held to disclose invention, though there would be no invention in the adoption of any one of the successive steps by which the result was attained. American Steel Foundries v. Damascus Brake Beam Co. [C.C.A.] 267 F. 574.

"There is no device of the prior art which is precisely similar. Patentable novelty may reside in the particular means used for accomplishing an old result. It may also lie in the use of old means in a new relation to produce a new result."

Plaintiffs argue that the analogy between the patent in this case and the one in the present suit is very close. They assert that the paper-making machine did no more than had previously been done by hand, namely, it transferred the wet sheet from the press rolls to the dry rolls by moving it at the same speed, namely, it merely did mechanically what had previously been done by hand; and that correspondingly, in the case at bar, the combined machines operate on a changed principle in that whereas in the prior art, the gummed and dried blanks had been delivered on to a delivery table and were then required to be restacked by hand on the feeding table of the folding machine, the combination of the patent eliminates this gathering by hand of the blanks and the restacking of them on the feed table, and instead, operates on the principle of a direct transfer of the blanks

in overlapped relation directly to the feed table of the folding machine without gathering and restacking them, a changed principle of operation that had never before been performed in the art.

. Cases of this character, viewed by different minds, are often difficult to reconcile. There is an apparent difficulty in so doing with respect to the doughnut-making machine and the paper-making machine embraced in the decisions just referred to, unless emphasis is to be placed upon the admittedly much more delicate nature of the operation involved in making paper, and the mechanical elimination of a substantial degree of error or loss in the old manual operation which has no precise parallel in the operations involved in making doughnuts. The question before us is: Upon which side of the line does the device of the patent in suit fall?

It is believed that the patent in suit should be sustained as a combination and not merely an aggregation of elements, and as accomplishing a new result. We find that the device of the patent in suit more closely approaches the combination of the paper-making machine just referred to than it does the combination in the doughnut-making machine, also just referred to. While it was not sufficient, in the case of the doughnut-making machine, merely to deposit the product of the one machine into the receiving end of the other, without some correlation in order to avoid congestion, the correlation of the two operations was much more definitely a mere matter of mechanics than in the case of the operations involved in envelope-making, because there was nothing between the cutting or forming of the raw dough and the putting of it into the grease, nothing to correspond to the gumming operation in envelope-making. In the gumming machine the blanks travel in overlapped formation; whereas in the folding-machine the blanks travel individually spaced, and each blank is in timed relation to the operations of the folding mechanism. In any combination two-machine process known to the prior art, this requisite individualized and timed condition of the blanks in the folding-machine was possible of attainment only by accurately hand-stacking the gummed blanks on the feed-table of the folding-machine; whereas in the combination device of the patent in suit, a mechanism has supplanted hand operation, and converts the overlapping band of blanks from the gumming-machine, without restacking them, into the individualized and timed blanks required by the folding-machine.

■■■ There is a presumption of validity of the patent by reason of its having been issued by the Patent Office. Furthermore, the patent in suit has never before been in litigation, and it has only three years more to run. A strong inference of its utility arises from its commercial success, and we do not find that either this presumption or this inference has been successfully rebutted. As was said in the Barbed Wire Patent, 143 U.S. 275, at page 283, 12 S.Ct. 443, 446, 450, 36 L.Ed. 154: "In the law of patents it is the last step that wins. It may be strange that, considering the important results obtained by Kelly in his patent, it did not occur to him to substitute a coiled wire in place of the diamond-shaped prong; but evidently it did not; and to the man to whom it did, ought not to be denied the quality of inventor. There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of a series of inventors, all of whom were groping to attain a certain result, which only the last one of the number seemed able to grasp. Conspicuous among these is the case of Webster Loom Company v. Higgins, 105 U.S. 580, 591 [26 L.Ed. 1177], where an improvement in looms for weaving pile fabrics, consisting of such a new combination of known devices as to give to a loom the capacity of weaving 50 yards of carpet a day, when before it could only weave 40, was held to be patentable. It was said by the court, in answer to the argument that the combination was a mere aggregation of old and well-known devices, that 'this argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed,—one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skilled persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. * * * Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps

not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.'"

And similarly, in Hildreth v. Mastoras, 257 U.S. 27, at pages 34, 35, 42 S.Ct. 20, 23, 66 L.Ed. 112, the court said, in sustaining a patent which embraced the important but long-delayed and therefore not obvious step from the pulling of candy by hand to the performance of the same function by machine, the ultimate effect of which, with the mechanical and patentable improvements of the device, was greatly to reduce its cost, and to enlarge the field of the art: "The history of the art shows that Dickinson took the important but long delayed and therefore not obvious step from the pulling of candy by two hands guided by a human mind and will, to the performance of the same function by machine. The ultimate effect of this step with the mechanical or patentable improvements of his device was to make candy pulling more sanitary, to reduce its cost to one-tenth of what it had been before him, and to enlarge the field of the art. He was, therefore a pioneer."

For the foregoing reasons, we conclude that the patent in suit is valid and that it has been infringed by the defendant. A decree will be signed in accordance with this opinion.