## DOUGHNUT MACH. CORPORATION v. DEMCO, Inc., et al.

## SAME v. JOE–LOWE CORPORATION et al.
### Nos. 1616, 1697.

District Court, D. Maryland.
July 1, 1931.

See, also, 39 F.(2d) 132; 42 F.(2d) 291.

Fraley & Paul and Frank B. Fox, all of Philadelphia, Pa., and Adams & Hargest, of Baltimore, Md., for plaintiff.

Edwin F. Samuels, of Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, District Judge.

These two suits involve alleged infringements of five patents covering machines for the automatic frying of doughnuts. Four patents are involved in suit No. 1616, namely, Tomlinson patent, No. 1,320,662, filed March 15, 1918, issued November 4, 1919; Sherman and Morris, No. 1,414,713, filed June 7, 1919, issued May 2, 1922; Bergner patents, No. 1,492,541, filed October 29, 1919, issued April 24, 1924, and No. 1,665,017, filed July 10, 1919, issued April 3, 1928. The remaining patent is involved in suit No. 1697, which was brought by supplemental bill, and, although heard separately, by stipulation the material part of the evidence in suit No. 1616 was brought into the second suit. This patent is to Nye, No. 1,599,916, filed March 7, 1924, issued September 14, 1926.

Plaintiff company is a large manufacturer of automatic doughnut making machines and special flours. It appears from the evidence that three of the defendants, namely, the Joe-Lowe Corporation, Demco, Inc., and Nye-Mosher Manufacturing Company, are closely interrelated in the manufacture also of automatic doughnut making machines and in the sale of flour; and also that the Joe-Lowe Corporation is in fact the selling agent for Demco, Inc., Nye-Mosher Manufacturing Company, and for Nymco Doughnut Machine Corporation, which latter company succeeded to the business of the Nye-Mosher Manufacturing Company in 1929. All three of these defendant companies have interlocking directors and officers, with the same office facilities in New York City, their principal place of business, and all have co-operated in selling the machines manufactured by the Nye-Mosher Manufacturing Company, Demco, Inc., and Nymco Doughnut Machine Corporation, in connection with flour manufactured by the parent company, namely, the Joe-Lowe Corporation. It is in evidence that various machines alleged to infringe were sold and at other times given away in connection with contracts for flour. The remaining defendant, namely, the E. H. Koester Bakery Company, a Baltimore concern, is joined as defendant on the ground that it has participated in the alleged infringement by owning and operating in its bakery two of the machines in suit.

Doughnuts, crullers, or sticks, as they are variously called, depending largely upon their shape, consist of specially prepared dough, fried in grease. The automatic frying of doughnuts, which, as appears from the evidence in these cases, has become a very extensive, profitable business, as well as the advantages to be derived from this form of cooking as opposed to the more primitive methods, may best be understood by a consideration of the effect of the hot grease upon the raw dough. When the raw dough is placed in the hot grease, it immediately sinks, creating gases within the dough which cause it to expand, so that it becomes buoyant and tends to rise vertically to its point of deposit in the hot grease. The automatic machines may all be said to have three main objects, to be accomplished mechanically: First, to form and deposit the piece of raw dough in the grease; second, to progress it from the point of deposit to the point where its cooking is completed; and, third, to take it out of the grease when the cooking is completed.

These automatic machines may be divided into three classes: First, the flotation type, which frys the doughnut while it floats on the surface of the grease, thus requiring that the doughnut be progressed, turned over about the middle of the course of its cooking, progressed again until the cooking is completed, and then taken out of the machine. Second, the submerged type, which progresses the doughnut while submerged throughout the entire period of cooking. Third, the combination flotation and submerged type, which may or may not embrace a device for turning over the doughnut in the course of the cooking process, and which provides for a period of floating and progressing of the doughnut on the surface of the grease so that, in its semicooked state, it can expand during the flotation interval or intervals, which are sometimes described in the art as "breathing spaces," since, if continuously submerged, the doughnut loses its ability fully to expand, without which the dough becomes more tough and consequently less edible. Also, by this

combined method, the proper amount of grease absorption is better controlled.

Because of the number of plaintiff's patents that are here involved and the variations in the types of machines embraced thereunder, it is not possible to summarize them by a composite description. Suffice it to say that, with some exceptions, hereinafter noted, the basis of plaintiff's entire claim rests upon the turnover device covered by its several patents, which device, it contends, defendants are infringing by their machines which, it claims, perform, for all practical purposes, although in a somewhat different manner, the same function covered by the broad claims in plaintiff's patents.

Defendants' machines here in issue are of two main types, designated throughout the litigation, and hereinafter described, as types A and B. Both types have long rectangular troughs with automatic conveyors, also an automatically operated dough-former at one end, and dough-depositor at the other end of the trough. Tested by the heretofore given classification, defendants' type A machine is a combination flotation and submerged cooker. It consists of a cooking vat, or trough, some seven feet long and two feet wide. At one end of the vat are two dough cutters or formers. From these, to the point where the finished doughnut is taken out of the liquid by an ejector-conveyor, is a distance of six feet. Beneath the cutters is a small conveyor belt completely submerged, which carries the raw dough, while submerged, to a second conveyor, which engages the dough as it rises from the first conveyor and carries it forward. This second conveyor, which is some twelve inches long, with its lower side slightly submerged, keeps the dough submerged and propels it forward into an area where it comes to the surface and floats along for some six inches, and is then engaged by a continuously operating rotary pusher, having a feathering paddle which enters the liquid in a radial position and leaves it in a rectangular position, turning the doughnut over while partly floating and partly submerged. Thereafter the doughnut passes in a floating position over another area of some twelve inches, until it is engaged by a third conveyor some eighteen inches long, inclined downward, the function of which is to hold the doughnut completely submerged until cooked uniformly all over, when it is again allowed to rise to the surface and float freely for the space of some ten inches, until it is engaged by an ejector-conveyor, which removes it from the trough, the cooking process being complete. The doughnut is propelled from one end of the tank to the other by the conveyor belts, by the movement of the cooking liquid, and by the paddle mechanism.

Defendants' type B machine also falls within the third class, namely, it is a combined flotation and submerged cooker. It is made in several forms, but basicly it consists of a hopper or cutter at one end of the cooking vat or trough, from which the dough drops and sinks to a conveyor completely submerged, by which it is moved for a distance of from three to five inches. The dough then rises and encounters the under side of a second conveyor, which is slightly submerged in order that the dough may be kept beneath the surface. After release from this conveyor, the doughnut is allowed to float freely for about two feet, until it encounters the under side of a third conveyor, one end of which is inclined several inches below the surface of the liquid and thereby submerges the doughnut for a distance of some fifteen inches. When released from this third conveyor, the doughnut rises to the surface and encounters a revolving two-vane paddle wheel or pusher, each vane four inches in width and so adjusted as to be submerged about one inch. When these vanes encounter the doughnut, they shove it along on the surface of the grease and it floats for a distance not exceeding approximately ten inches, until it encounters a fourth conveyor of approximately the same length as the third conveyor, which carries the doughnut submerged for some twelve inches or more, when it again rises to the surface and floats freely until lifted out of the cooking liquid by an ejector-conveyor. The doughnut is propelled through this process of cooking from one end of the tank to the other by the conveyor belts, by the movement of the cooking liquid, and also in part by the paddle mechanism.

The principal form of defendants' type B machine, of which plaintiff complains, is constructed with a wire mesh around the third conveyor, the effect of which is to turn over the major portion of the doughnuts. The evidence of the various witnesses is extremely conflicting as to the extent of the turnover; it varying from 20 to 97 per cent. The inspection of a machine of this type afforded to the court indicated that at least a large proportion of the doughnuts were turned over.

Defendants resist the claim of infringement on two grounds: (1) Invalidity of plaintiff's patents because anticipated by the

prior art; and (2) denial. Summarized, the first ground is that none of the claims of plaintiff's patents in suit presents any new device because readily capable, even if not intended, by general application of the art as already disclosed, of cooking, not merely doughnuts, but various kinds of food in a liquid medium. The second ground is that defendants' type A machine does not infringe the Tomlinson or any of the other patents, because they must be construed as not only limited to a turnover device, but also to a surface or flotation cooking type of machine, in which the doughnuts are first completely browned on one side, turned over, and completely browned on the other side; and that, as to type B, its turning over of the doughnuts is of no advantage and merely accidental. In other words, that the performance, incidentally and without advantage, in defendants' machine, of the primary function of plaintiff's machine, is not infringement.

In the early stages of these suits, this court (Judge Soper) twice had before it, on application for a preliminary injunction, both the A and B type of defendants' machines in the forms heretofore described. 39 F.(2d) 132; 42 F.(2d) 291. In the first instance, an injunction was denied because of the laches of plaintiff respecting defendants' type A machine. However, Judge Soper found that it did infringe, saying, page 134 of 39 F.(2d): " * * * The machines of Type A infringe the first claim of the patent in suit. This conclusion is reached notwithstanding the contention of defendants that in type A machine the cooking is in part by the submerged rather than the flotation method described in the patent; that the doughnuts are turned over inside the grease instead of in the air as in the machine illustrated by the patent, and that the length of time for the frying operation is predetermined with more exactness in the method described in the patent than is possible with the machine under discussion. Nor is there any substance, in the opinion of the court, in the fact that the paddle wheel by which the doughnuts are turned over in the defendants' machine moves in the same direction as the current of flowing grease, while in the infringing machine in the case in the Ninth Circuit [Bake-Rite Mfg. Co. v. Tomlinson, 16 F.(2d) 556] the paddle wheel moved in the direction opposite to that of the flowing grease. It is doubtless true that in the defendants' machine in the pending case the paddle wheel assists the acceleration of moving current, but, since the paddle wheel also turns over the doughnuts, infringement is made out."

At this first hearing, defendants' type B machine was not in evidence equipped with wire mesh on any of the conveyor belts, but with a paddle wheel, and the court said, page 134 of 39 F.(2d): "The adjustment is such that the blades of the paddle are not submerged to a sufficient depth below the surface of the liquid to turn the doughnuts over, and hence there is no application of the gist of the Tomlinson method." But the Court added, page 134 of 39 F.(2d), "it is, however, clear that the machine as described by the witnesses would infringe if a slight change were made whereby the axis upon which the wheel turns should be lowered so that the blades of the paddle would penetrate sufficiently below the surface of the liquid to turn the doughnuts over as they pass."

At the second hearing, this court adhered to its original finding with respect to defendants' type A machine, but, being presented with evidence that type B machine was used with the wire mesh, granted a preliminary injunction against same, saying, page 292 of 42 F.(2d): "Expert observers on behalf of the plaintiff have filed affidavits that the machine in question in operation turns over as much as 60 per cent. of the doughnuts in the course of manufacture, and defendants' expert swears that in the operation of the machine, the percentage turned over at times will be over 50 per cent., and at other times, less than this amount. It seems to be agreed that the number of doughnuts turned over depends upon certain variable conditions, more or less subject to the control of the manufacturer, such as the temperature of the grease, the level of the cooking liquor, the size and quality of the dough and doughnuts, etc. It was the opinion of the plaintiff's experts that the turnover of the doughnuts was due to the use of the wire mesh covering the moving belts, but defendants' expert takes the position that the turnover takes place in the machine described irrespective of the use of the wire mesh. In either case, there is a substantial infringement of claim 1 of the Tomlinson patent, No. 1,-320,662, interpreted by the Circuit Court of Appeals of the Ninth Circuit in Bake-Rite Mfg. Co. v. Tomlinson, 16 F.(2d) 556. Therefore the court is of the opinion that the plaintiff is entitled to an injunction pendente lite, so far as machines of the form B construction are concerned."

It appears that defendants, as a result of the above findings by this Court with respect to the infringing character of the type A machine, removed the paddle wheel turnover and added another conveyor. But plaintiff claims that defendants have merely repeated the same infringement by equipping its type B machine with wire mesh on the third conveyor, and that the complete evidence presented to the court since the preliminary hearing fully corroborates plaintiff's contention that both types of defendants' machines infringe.

We will now address ourselves to a consideration of each of the five patents in suit in the light of both grounds of defense, namely (1) invalidity because of anticipation by the prior art; and (2) noninfringement.

### Tomlinson Patent.

First as to the Tomlinson patent, claims 1 and 2 only are in suit. Claim 1 is as follows: "In an apparatus of the character described, a receptacle for hot grease, mechanism for turning doughnuts or the like over after they have been in said receptacle for a predetermined length of time, and mechanism for thereafter removing them after a further predetermined length of time." In Bake-Rite Mfg. Co. v. Tomlinson et al., 16 F.(2d) 556, 557, the Circuit Court of Appeals for the Ninth Circuit affirmed the District Court in holding that this claim was valid and infringed by a device which embodied "the substance of the invention of the Tomlinson patent," and which is described by the court, pages 557, 558 of 16 F.(2d), as follows: "A trough or channel of uniform width throughout its length; mechanism for turning doughnuts after they have been in the receptacle for a predetermined length of time; co-acting parts combined which propel the doughnuts through the trough at a rate of speed that they will arrive at the turnover device at a time subsequent to deposit in the trough, and will thereafter be conveyed from the turn-over device to the conveyor, where they are to be removed after a further period of time. Defendant has constructed his trough in spiral form, but his purposes and objects are the same as plaintiff's."

Claim 2 of Tomlinson is as follows: "In an apparatus of the character described, a receptacle for hot grease, means in one end of the receptacle for carrying doughnuts or the like through that end of the receptacle and then removing them therefrom, and means in the other end of the receptacle for carrying the doughnuts or the like through that end and delivering them to the aforesaid means in an over-turned condition." The Tomlinson structure is quite simple. There are two conveyors completely immersed in the hot grease, except for parts of their vanes. Each conveyor has an upwardly inclined portion; that of the first conveyor being located substantially in the middle of the tank, and that of the second conveyor being at the right-hand end of the tank. The conveyors are driven in the same direction. The doughnut is laid upon the left-hand end of the first conveyor, is carried through the grease at such speed as to insure its proper browning on the under side, whereupon it rides up the inclined portion of this first conveyor, from which it is dropped onto the left-hand end of the second conveyor, being turned over as it falls. Thereupon, this second conveyor carries the doughnut, now inverted, through the grease as did the first conveyor, until the other side is properly browned, when it rides up the inclined portion of the second conveyor and is discharged from the opposite end of the tank or vat from which it entered.

Respecting the defense of prior art, defendants rely upon patent to Varian, No. 1,086,248, issued February 3, 1914, and patent to Snyder, No. 1,031,481, issued July 2, 1912. Varian was also relied upon in the Bake-Rite Case, supra. Its function may be adequately described by quoting from that court's opinion, page 557 of 16 F.(2d): "Varian showed means for predetermining the time during which an article being cooked is progressed through the circular channel by the flow of the cooking liquid. His device was for vegetable slicing and cooking, especially Saratoga chips, but Varian failed to show any means to turn over the article being cooked from one side to the other at a given time during the cooking operation. * * * The matter is clarified by the testimony that in Varian's patent the paddle shown, when brought into contact with a doughnut, would mutilate it. Sometimes it would turn the doughnut over, but at other times the doughnut would stick to the blades and be carried around and around for many times." The testimony in the present proceeding, and the reproduction of the Varian device which the court viewed in operation, confirm this finding, to the extent that at times doughnuts were mutilated by the blades, were turned over, or that both of these things occurred.

As for the Snyder patent, it is obviously not relevant because it has nothing to do with cooking, but embraces a machine for assorting corks; its object being to pro-

vide an improved means for assorting and floating corks by feeding them from one endless belt to another at a lower level.

As to the defense of noninfringement, we conclude that this is equally untenable, because it is uncontradicted that both the feather paddle blade on defendants' type A machine and the wire mesh on their type B machine turn the doughnuts over, and therefore, even assuming that such turnover in its actual operation is irregular, accidental, and nonbeneficial in the cooking process, it is, in fact, a function of the Tomlinson device which is entitled to complete protection under the broad claims when read, as they must be, in the light of the specifications. It is futile to attempt to rest a valid distinction upon the variations in the flotation, submerged, or partly submerged cooking periods that exist in defendants' machines and in Tomlinson's. The use of the phrase "predetermined time" in claim 1 of Tomlinson should not be given any such artificial meaning. As was said in the Bake-Rite Case, supra, page 558 of 16 F.(2d): "Inasmuch as defendant's machine is intended to produce a doughnut satisfactory for commercial market, the current of liquid flowing through channels must operate to predetermine the time during which the object floating will travel therein, or, in other words, the time consumed in traveling the course must equal the time necessary to cook the doughnut properly." In short we are fully prepared to conclude on the evidence in the present case, that both of defendants' devices embody the substance of the invention of the Tomlinson patent, and therefore infringe. It is not sufficient that a baffle plate, fixed on the shaft, has been substituted for the paddle-pusher on defendants' type B machine for the purpose of preventing the turning over of the doughnut by the wire mesh, because the baffle, if properly adjusted and revolved, becomes, in effect, a turnover device. Plaintiff has no protection against purchasers of defendants' machines being thus equipped and operated, and plaintiff is entitled to such protection. Newhall v. B. & O. R. R. (D. C.) 258 F. 650; Engineer Co. v. Blaisdell Canady Co. (C. C. A.) 220 F. 673.

### Sherman and Morris.

Coming next to the Sherman and Morris patent, this covers a submerged cooker. Claims 3, 4, and 12 are the ones upon which plaintiff relies. Claim 12 is the broadest, and is as follows: "In apparatus for cooking articles by contact with hot cooking liquor while submerged therein substantially throughout the cooking period, the combination of conveyor belt means for progressing the articles through the liquor submerged therein, and engaged with such conveyor means by virtue of their buoyancy, and for thereafter elevating the articles out of and above the liquor to a point of delivery; and downward sloping discharge means receiving the articles from the conveyor means."

It is to be noted that all three of the claims in suit call for submerging the product in the liquid substantially throughout the cooking period. In support of their plea of anticipation by the prior art, defendants rely principally upon the patent to Eagle, No. 529,483, issued November 20, 1894, and patent to Cleveland, No. 1,234,131, issued July 24, 1917. A mere statement of the purpose of the former patent is sufficient to disclose its complete irrelevancy. It has no relation whatever to cooking food, but relates to apparatus for conveying hogs through and removing them from scalding vats. The Cleveland patent, while embracing an apparatus for cooking various food articles, especially for frying fish in oil, has nothing to do with holding articles down against their buoyancy.

As for infringement, we conclude that a proper construction of all three claims, while perhaps not limiting them to submergence of the article of food for the entire cooking period, nevertheless does presuppose that there shall be no opportunity for "breathing," as that term is understood where a plurality of conveyors are used. In other words, Sherman and Morris embraces only one conveyor, and, since all of the various machines of defendants claimed to infringe have more than one conveyor, it would be extending too far the Sherman and Morris claims to say they cover defendants' devices. To do this would virtually be tantamount to saying that these claims were anticipated by Varian and therefore invalid, which we do not consider to be the case.

### Bergner Patent, No. 1,492,541.

Five claims of this Bergner patent are in suit, namely, 1, 6, 7, 51, and 58. Summarized, the device as disclosed in varying form in each of these claims is a combined doughnut cutting or forming device, and a cooking device, whereby the doughnut is formed and then released intermittently, in definite correspondence and correlation with conveyors which progress the doughnut through the cooking stage. Claims 1, 6, and 51 provide means, or its equivalent, for turning over the doughnut in the course of the cooking. Suffice it, therefore, to quote claim 1, which is as

follows: "In apparatus for forming articles such as doughnuts and cooking them with hot liquor, the combination of means for forming raw articles in hollow configuration and releasing them over the liquor to drop in a horizontal position; means for progressing the articles in the liquor; and means for turning over the articles at a point in their progress where they have acquired sufficient stability therefor by cooking." Of the remaining two claims, namely, 7 and 58, suffice it to quote the latter, which is the broadest, and is as follows: "In apparatus for cooking articles such as doughnuts with hot liquor, the combination of means including a succession of moving engagement members immersed in the liquor for progressing the free doughnuts supported by the liquor; means for introducing the free doughnuts at automatically predetermined definite intervals operating in definitely and automatically maintained correspondence and correlation with the succession of the aforesaid members, to be engaged and progressed by them; and means for ejecting the doughnuts also at automatically predetermined definite intervals operating in definitely and automatically maintained correspondence and correlation with the succession of said members, and with their introduction."

■ First, on the plea of anticipation, defendants rely upon Varian, supra, and Wixey, No. 1,265,854, as to claims 1, 7, and 51, and Varian alone as to claims 6 and 58. Enough has already been said respecting Varian to show that it is not applicable. Regarding Wixey, suffice it to say that it covers merely a dough-forming device. If it be argued that what Bergner has done is merely to place in workable combination the old device of the Wixey dough-former with the old device of the Varian cooker, it is, of course, obvious that they are capable of no such correlated workable combination as to produce the result obtained by the Bergner device. The law regards a change as a novelty, and the acceptance and utility of the change as further evidence or demonstration of novelty. It has long been settled that all the elements of a mechanical combination may be old, and yet it may be patentable. Hubbell v. United States, 179 U. S. 77, 21 S. Ct. 24, 45 L. Ed. 95; Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 301, 29 S. Ct. 495, 53 L. Ed. 805; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527; Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co. (C. C. A.) 139 F. 312; Ingersoll v. Delaware & Hudson Co. (C. C. A.) 37 F.(2d) 465; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp. (C. C. A.) 40 F.(2d) 910.

As was said in the Hubbell Case, supra, which was concerned with an improvement in metallic cartridges, page 86 of 179 U. S., 21 S. Ct. 24, 28: "Nor can we accept the contention that these two combinations are identical because they are intended to obtain the same result. What we have to consider is not whether the end sought to be effected is the same, but whether the devices or mechanical means by which the desired result is secured are the same." Again, in Diamond Rubber Company Case, supra, the Supreme Court, in dealing with a patent for an improvement in rubber tires, said, page 435 of 220 U. S., 31 S. Ct. 444, 447: "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

The guiding principle is again exceedingly well stated in the Imperial Bottle Cap & Machine Company Case, supra, which had to do with a bottle stopper patent. There the Circuit Court of Appeals for this circuit said, page 320 of 139 F.: "The finding in the old devices, one portion here, one in another, and so on, should not defeat a patent for the combination, which is only truly anticipated by a prior device having identically the same elements, or their mechanical equivalents, cooperating to produce the same results. Even if any of them nearly approached the complete invention, if they were not operative or available there would be the presumption that they were not identical with one of admitted superiority, the merits and utility of which are proved by general use. Granting that the elements were known, something before unknown had to become known. A new operative means had to be devised, by which what was known could be made available, and a creative or inventive faculty had to be invoked and exercised to discover the availability of a mode of application by which forces already known could be so united as to effect results desired, and theretofore sought in

vain. The unknown and untried factors had to be united with the known factors, and the combination of these elements into a practical operative means, and its embodiment into a concrete thing, constitute invention."

Turning now to a consideration of whether or not defendants' machines infringe any of these five claims of the Bergner patent, both types of defendants' machines have (1) "a succession of moving engagement members for progressing the articles in the liquor"; (2) a cutter above the liquor to form and release the articles "intermittently to drop directly in a horizontal position"; (3) they both cause the doughnuts to be supported by the liquor during certain stages in their progress through the cooking; and (4) both provide means for ejecting the doughnuts by synchronized arrangement with the other moving parts of the device. Thus it is clear that both types, regardless of the inclusion of the turnover devices, infringe claims 7 and 58.

Claims 1 and 6, which provide for a turnover or its equivalent, are also clearly infringed by defendants' type A machine, and also by defendants' type B machine with a wire mesh on the third conveyor, or by lowering the shaft of the paddle pusher.

Lastly, respecting claim 51, we find a new element in this claim in that the power is provided "from beneath the receptacle." The application of the main driving shaft on defendants' machine being on a lower level than the tank or vat, the device is to be taken as substantially similar to that called for in claim 51.

A good deal was said by various witnesses for the defendants about the difference in correlation of the various progressive movements in the defendants' machines and in the Bergner machine. In short, it seems to be contended that the same form of correlation must be adopted in order to infringe the Bergner patent. However, we consider this to be too great a refinement of the language contained in the Bergner claim. While the word "synchronized" is not used in any of them, assuming that it is a proper substitute for the words or phrases that are used, we consider that all that is meant is that each movement forming a part of the progressive cooking of the doughnut must be harmonized with every other movement in the process, to the end that the doughnut will reach the grease at exactly the right moment, neither stay too short nor too long a time in any one spot, whether immersed or afloat, whether on one side or the other, and will thus reach the end of its journey through the vat and be taken out a finished product at exactly the right time to insure its being the most toothsome morsel of its kind that can be commercially produced.

### Bergner Patent, No. 1,665,017.

[9] Three claims under this patent are in suit, namely, 12, 18, and 19, which are as follows: "In apparatus for cooking articles such as doughnuts, afloat in hot cooking liquor, means for introducing the articles, a rotary paddle for turning over the articles, and means for imparting intermittent flipping movement to the paddle to insure inversion of the articles." No. 12. "In a doughnut cooking machine the combination of a vessel to hold the heated liquid, means to circulate the liquid in said vessel, and a revoluble grid or grids to turn over the doughnuts." No. 18. "In a doughnut cooking machine the combination of a vessel to hold the heated liquid, means to circulate the liquid in said vessel, and an intermediate revoluble grid or grids to turn over the doughnuts." No. 19.

First, with respect to the plea of anticipation by the prior art, Varian, supra, is relied upon. Also patent to Comb and Peavey, No. 133,389, issued March 19, 1920. For reasons heretofore given, the Varian disclosure cannot be taken as an anticipation. Quoting from the specifications of the Comb and Peavey patent: "The invention relates to machines for cooking doughnuts and the object is to provide a machine for cooking or frying doughnuts in grease or deep fat without manual handling of the doughnuts. Another object is to provide a machine of this class, in which the doughnuts will be conveyed through hot grease contained in a receptacle and will be turned over during their progress through the receptacle so as to be uniformly cooked on both sides." Comb and Peavey functions as follows: The doughnut is carried first by a conveyor belt to, and dropped into the receiving end of the hot grease receptacle, where it is picked up by another conveyor with fingers and carried, submerged, by these fingers, to a paddle wheel located in the middle of the receptacle. The blades of this paddle wheel push the doughnut down and turn it over by carrying it around through 180 degrees, whereupon, still submerged, it is engaged by the fingers of another conveyor similar to the second one above described, which carries it to the delivery end of the receptacle, where it is lifted and deposited upon a fourth conveyor belt

which completes the process by carrying the doughnut away from the receptacle. While quite similar to the Bergner device, it cannot be said to anticipate, because (1) it provides no means for circulating the liquid as required by claims 18 and 19 of Bergner, the Comb and Peavey conveyors all being entirely above the surface of the liquid except for the small fingers, which cannot appreciably circulate the liquid within the contemplation of Bergner; and (2) the Comb and Peavey paddle wheel revolves at even speed, and therefore provides no intermittent flipping movement in the turnover, as required by claim 12 of Bergner.

It appears that the Bergner application was in interference with the Lindsey application. The latter succeeded before the Patent Office, and this resulted in the issuance of the Lindsey patent, No. 1,659,383. Nevertheless the Patent Office allowed the present claims to Bergner, and we think rightly, because the respective turnover devices are essentially different; Lindsey's consisting of two small superimposed belts moving in opposite directions, from one of which the doughnut falls to the other and turns over by gravity in so doing, whereas Bergner employs the rotary paddle or grid. If, as stated by plaintiff's witness Wadsworth, the Lindsey device is not in fact inoperative, it would appear to be commercially impractical, as evidenced by the fact that the Lindsey-Bake-Rite machine, involved in the litigation in the Ninth circuit was fitted with the revolving paddle blade turnover of Bergner.

[10] Turning to the question of infringement, we agree with plaintiff's contention that one of the three claims of Bergner in suit is infringed by defendants' type B machine, namely, claim 12, but claims 18 and 19 are not infringed for the following reasons: Defendants' type A machine has all of the elements of claim 12, the feathering blade corresponding substantially by construction and functioning to the paddle wheel, and the requisite "intermittent flipping movement" being imparted by means of an eccentric cam connected with the feathering blade. However, since "a revoluble grid or grids to turn over the doughnuts" are a basic element of claims 18 and 19, we must hold that they are not infringed by defendants' machines because neither type embraces a grid as that term is, we think, to be understood in the art, namely, a griddle, that is to say, a receptacle or tray of grating construction, which is not sufficiently simulated by a mere perforated blade, as in defendants' type

A machine, or by the wire mesh covering on the conveyor in defendants' type B machine.

### Nye Patent.

There is only one claim (No. 4) of this patent in suit, and it reads as follows: "In an apparatus of the class described the combination of a tank for holding a cooking fluid, means adjacent one point for feeding uncooked doughnuts into said fluid, means for holding said doughnuts temporarily in spaced relation and for removing them away from the feed point, other means for moving said doughnuts, said first mentioned moving means terminating short of the second mentioned means, thereby providing a gap which enables the doughnuts by flotation to distribute themselves laterally before being brought under the influence of the second moving means."

It will be seen that the distinction over claims in other patents hereinbefore discussed is the provision for a space between the first two and the third conveyor in which the doughnuts are allowed to rise to the surface, for the purpose of distributing themselves laterally before being again submerged by additional conveyors.

Turning to the plea of anticipation by prior art patents, defendants rely primarily upon Sherman and Morris, and Varian, both heretofore considered, and also upon Dunn, No. 1,440,663. Enough has already been said respecting the first of these patents. As for the third, it is sufficient to point out that it is designed without permitting any "break" or flotation period in the course of the doughnut's progress through the grease. In short, in none of these three patents, nor in any that have been disclosed, is there a means provided whereby the doughnut is first held submerged, then released to float in a gap between the conveyors, and then again submerged by another conveyor. It appears that it was this particular combination of the elements disclosed in the Nye, and undisclosed in the prior art, which led the Patent Office to grant Nye's claim, and we think rightly. Defendants infringe, because this gap is provided in both their A and B machines; in both instances a flotation period being provided after the doughnuts' original submergence upon leaving the second conveyor. Nor can defendants' claim of prior invention by Nye, by virtue of the machine which he admitted having manufactured in 1921 or 1922, as evidenced by a rough drawing produced in evidence, be of any avail to them, first, because in this sketch the gap or

flotation period is lacking; and second, because Sherman and Morris, issued in 1922, antedates the Nye manufacture.

In view of what has just been said, it becomes unnecessary to decide whether plaintiff must also succeed upon another and quite independent ground, namely, whether defendants can now be permitted to attack the Nye patent by virtue of their prior conduct. It appears that on December 6, 1927, that is, about a year after the Circuit Court of Appeals for the Ninth Circuit held the Tomlinson patent valid and infringed by the Bake-Rite device, defendants procured a license from Nye to operate under the patent now in issue. On November 20, 1928, they were given notice of infringement of plaintiff's patent, including the patents here in suit, and thereupon, on February 19, 1929, they gave notice to Nye of cancellation of the license effective sixty days thereafter, upon being advised by counsel that they were infringing plaintiff's patents. It appears, however, that defendants, after cancellation of their license, continued to make and to sell their type A and type B machines. While, generally speaking, a license lawfully canceled relegates the parties to their status before the granting of the license, there are exceptional cases, but, as has just been said, it has become unnecessary to decide whether the rule or an exception is applicable in the present situation. See Hutto Engineering Co. v. Grinder Sales Co. (D. C.) 18 F.(2d) 985.

Summarized finally, defendants' contention is that, of the five patents in suit, three, namely, Tomlinson and the two Bergner patents, cover strictly the flotation type of machine, in which the product, either for the entire cooking period or after it has acquired buoyancy, is floated and propelled along the surface of the liquid, being turned over positively and definitely at a predetermined point in its progress to brown what has previously been the top side of the doughnut, and that these patents neither describe nor suggest any other method of cooking. As for the two other patents of plaintiffs in suit, Sherman and Morris and Nye, defendants claim that they are limited strictly to a submerged operation in which the product is held beneath the liquid throughout its progress of cooking and both sides are browned simultaneously. Defendants urge that none of the claims of these patents can be read on defendants' structures, because the latter do not suggest imitation and are very much more similar to the prior art. Defendants contend that their machines are essentially submerged cookers which cause the product to be cooked or browned on both sides in one operation so that they need not be turned, and that this, therefore, is not the equivalent of a surface conveyor which causes cooking or browning on one side only so that the product must be turned; further, that a submerging conveyor, the function of which is to submerge the doughnuts so that they can be cooked simultaneously on both sides, but which releases them beneath the fat so that some of them turn in coming to the surface, accidentally and without beneficial effect, is not the equivalent of a mechanical turner, the 100 per cent. operation of which is necessary to a 100 per cent. commercial product. In short, defendants contend that plaintiff's device and their own perform entirely different functions in a different way; that each is an element of a different combination of which the other elements are also different, and that the only similarity is in the product or result, which cannot be the subject of a patent. However, with this we cannot agree, because, from what has already been said, even assuming, without deciding, that the turnover function in defendants' machines is accidental, spasmodic, or irregular, and nonbeneficial, as part of the cooking process, the fact remains that it is a function basicly similar to that performed by plaintiff's machines, and entitled to the protection under the broad claims of their patents. In short, defendants cannot be relieved of their wrongdoing on the ground that, although they have infringed, it has been badly done. Defendants' counsel has epitomized and made composite their contention by the phrase used in argument, that defendants' machines are "lineal descendants of the Varian patent." Enough has been said to show that this argument is untenable.

In conclusion, it may be added that, were there any doubt about plaintiff having sustained the burden of proving infringement, such doubt should be resolved in its favor by reason of the commercial utility of its product. It is in evidence that its business on its patented machines has increased in some six years from less than one-half million dollars to approximately three millions. But we are satisfied that plaintiff has sustained the burden of proving infringement except as to claims 3, 4 and 12 of the Sherman and Morris patent and claims 18 and 19 of the Bergner patent, No. 1,665,017, and that defendants have totally failed to sustain the burden which rests upon them of establishing invalidity and anticipation. A de-

cree will be entered in accordance with these findings, granting plaintiff the injunctive relief prayed for. The entire matter of profits and damages to be allowed, including the question of whether plaintiff is entitled, as it claims, to triple damages on account of alleged aggravated and continued infringements, will be deferred, pending reference to a special master to determine and report the profits and damages.